The Estate of Paul Silva v. Andrew Murrow Stacey Plotkin-Wolf, on behalf of Appellants, Defendants, Andrew Murrow, and Louis Maggi. We ask that the Court reverse the District Court's denial of qualified immunity and grant qualified immunity on the first prong, finding that there was probable cause, or on the second prong, finding that the law was not clearly established. I'm going to reserve two minutes for rebuttal, please. I'll start with prong two. There were four errors in the District Court's analysis of the second prong of the qualified immunity analysis. Initially, the Court said that since there was no probable cause under the first prong, that there could not be qualified immunity. The Supreme Court has already done away with that argument in Hunter v. Bryant. In Hunter v. Bryant, the Court said that by saying such, it puts immunity in the hands of the jury, which is improper and should be decided by a court long before a trial. The Court said that by doing so, the Court should be asking whether the officers who were acting under settled law, not if there was another reasonable or more reasonable interpretation that could be constructed years later. The second error by the District Court was whether the Court defined the law at too high a general – excuse me – too high a level of generality, which the Court did here. If we look at the District Court's order, the District Court ruled basically that it's clearly established that arresting somebody without probable cause is a violation of the Fourth Amendment. And then the second part of its order was that it's clearly established that – Let me ask you a couple questions. Yes, Your Honor. Okay, so I'm looking at the original dispatch report that all the officers got. There was testimony they all had it. It says Leslie Allen, who was Mr. Silva's mom, she's requesting PERT, which is the Psychiatric Emergency Response Team. Son, Paul Silva, 39 years old, 250 pounds. You know, what he's wearing, no weapons, no 647F, that's no public intoxication, right? No 11-550, that's under or use of controlled substance, right? That's what it says. Diagnosed schizophrenic, should be on meds, but reporting party thinks he's off them. Is outside yelling and screaming. Per reporting party, Silva is cooperative when PD called in past. So that's the information they had, right? No 647F, no 11-550, right? Psychiatric, not on meds, right? That's what they got. Okay, so then when we go to what information did they have about whether he was on – separate from what Mr. Silva said. He repeatedly said he hadn't, but let's look at what the officer says Allen said. So when they – this is Officer Magi. Yeah, yeah, yeah, put him over there. Did she say when the last time he smoked was? Derisio, oh, she doesn't know. She know that it's been recently. So there's no – and then there's no understanding of what recently means, right? There's other testimony from Derisio where he says, you know, she doesn't know. So if she is the source of the recent use, she didn't even define recently because she didn't know what recently was, correct? Yes. Okay, all right. Then let's look at the tests, right? So the officer, Moro, says, well, he had horizontal gaze nystagmus, but in the training manual it says that that is not present in people who are on stimulants, right? Yes. But Mr. Silva had that, correct? Yes. Okay. On pupil size, if you're on stimulants, your pupils are dilated, but Mr. Silva's were constricted, correct? Yes, generally. Okay. Well, let's say it's only constricted if you have chronic use, right? Is that why you're qualifying it with generally? Right. Okay. But if you are a chronic user, you're very rail thin, you've got pockmarked skin, you often have those really dissolved and black teeth. He didn't have any of that, right? He was 250 pounds. He was a big guy, correct? If you're a chronic user, yes, Your Honor. Okay. So he didn't have any of the physical symptoms of chronic user, right? Okay. All right. So his pulse rate was elevated, right? That's correct. His mom did say multiple times, he's scared of the police. And when you watch the video, he says so many times, please don't hurt me, please don't hurt me, correct? Yes, near the end. Yeah. So and then on the Romberg test, trying to guess up to 30 seconds, he was fast on that from the video. But that's also consistent with schizophrenia, correct? Yes. Okay. All right. Let's look at the declaration that Officer Murrow submitted in support of the summary judgment motion. I'm looking at paragraph 25. I'm just going to read it. I decided to detain the decedent to investigate if he was under the influence of a controlled substance in violation of California Health and Safety Code section 11-550, or if met the criteria for being detained and taken into custody under California Welfare and Institutions Code section 5150. Now 5150, that's the mental health one, correct? That's the reason that they got called.  Right? They thought this was going to be a 5150, the mental hold, if you're going to hurt yourself or hurt somebody else potentially. Yes. Okay. And he says, because of the observations I made and decedent's admission that he was in possession of drug paraphernalia, and that drug paraphernalia is the marijuana pipe, correct? Yes. Okay. But that's not a crime in California to have a possessive marijuana pipe, correct? No. But it's an indicia, usually from officers, that there could be other drug use going on. Right. But he said that, well, let's talk about that, because that will come up. But drug paraphernalia, the marijuana pipe is not considered drug paraphernalia under California law, correct? Is that correct? That is not, but officers are also trained that when people are using something like marijuana, they are often using other types of drugs. So if I possess a marijuana pipe, does that mean you can detain me or arrest me for 11-550? Because a marijuana pipe, which is not a crime in California, is not considered drug paraphernalia, still means that that's going to be a crime. Of course not. But that's not all that was going on here, because they also had him detained for an evaluation under 5150, and under the totality of the circumstances with the other things. But they didn't take him in on 5150. They arrested him for 11-550. They arrested him for a crime, right? 5150 is civil. Yes. That's not a criminal incarceration, right? No, but they still need to have probable cause, and they were still investigating both. So at the time that they were investigating the 11-550, they were also investigating the 5150. So under the totality of the circumstances when they were seeing his behavior, the way he was presenting himself, his disheveled appearance, the dry tongue. Can I ask you something? It's so he has in his paragraph 13 something very similar to what you just said. It says, It has been my experience that prior use of narcotics and possession of drug paraphernalia are factors that are strongly related to possible present intoxication of controlled substances. But under California law, the marijuana pipe is not drug paraphernalia. Correct? So what was he referring to? What is the drug paraphernalia that Mr. Silva possessed that was the evidence of current 11-550 use of a controlled substance? I cannot tell you what was in his head. Please speak into the microphone. I'm sorry, Your Honor. Yes. I can't tell you what was in Officer Murrow's head as I'm standing here today. I can tell you he was taking the drug paraphernalia. Or what was thought to be drug paraphernalia than the marijuana pipe.  As far as I know, no. Is there anything in the record that says there was other drug paraphernalia other than a marijuana pipe, which is not actually drug paraphernalia under California law? No, Your Honor. But it really doesn't matter under the second prong of the qualified immunity analysis. Because when you take everything else, the totality of the circumstances when they were doing an evaluation, all of which, most of which, they would have had to do under the 5150 analysis to determine if he was a danger to himself or a danger to others or gravely disabled, they would have made a lot of the same findings and would have came to the same conclusion, especially after Officer Murrow was told that there was recent use. So what was the evidence that excluded a conclusion that 5150 was appropriate? What is the evidence? That it was not appropriate? Right. If you're saying they were really looking at this as a 5150, what is the evidence that this was not a 5150 and was a use? There was no indication as the officers were there that he was a danger to himself, a danger to others, or that he was gravely disabled. While they were there, he was not threatening anybody. He was not suiciding. So the fact that his mother locked herself up in her car because she's afraid of him and said, you need to please get Pertz to take him in, was it not a concern that reporting party was so afraid of him that she locked herself in her car? Of course it was. To be protected from her own son? Of course it was a concern and part of the evidence. But the officers couldn't take everything that she said at face value. They're required under the law to do an independent investigation, and that included talking to Mr. Silva. And in their conversations with him and their evaluation of him, he wasn't doing anything that appeared to be a danger to others. He wasn't threatening anybody. He wasn't saying that he was going to hurt himself. And they knew that he had shelter. He was clearly able to feed himself. And other than the odd shirt he was wearing, he was able to wear clothing. He was wearing three jackets, right? He was wearing two jackets, and he's wearing a tiny women's leopard skin sweater underneath. And he's carrying around all these garbage bags, and he's carrying around broken glass in his pocket. And he's saying, give my mom a ticket because she's not listening to me. And he's saying all these very odd things about needing to go to the recycling center, needing to return a book at the library. Nobody questioned that he was mentally ill, but that's not the standard for taking somebody in under Welfare and Institutions Code 5150. It's not. 5150 says you have to not only be mentally ill, but you also have to be a danger to yourself, a danger to others, or gravely disabled. And he just did not meet those qualifications, those other criteria. But they did feel, after evaluating him and hearing that he had recent use, that there was reason to take him in for an 11-month period. And none of the officers could define what the definition of recent was in the recent use statement, correct? Even the mother, who was supposed to be the source of that statement, could not define what recent was, right? I do not understand. I understand that it was not asked, so no. Okay. And you would agree, watching the video, that Mr. Silva was very calm and cooperative with the police. Yes. At least when you spoke to them. For the most part, yes. I mean, he was talking very quickly. He was rambling. He was, as you said, under the Romberg. It took him four seconds to get to 30 seconds. That's all consistent with schizophrenia, which is what was the basis for the reporting person's request that the police come, correct? Yes. But officers cannot be expected to be able to differentiate the difference between schizophrenia and being under the influence. Even the appellees' experts said that they, that medically trained people, often can't tell the difference. But there was no emergency here, right? There was no need to make a split-second decision. Nobody's life, as you said, nobody's life was in. This was a slow investigation. They could have taken their time to figure out which one was more appropriate, right? They did take their time. They were there for quite a length of time. And they clearly knew that there was not. It was eight minutes, right? It was eight minutes. Since they got there. By the time they decided to arrest him and take him in the car. They did a thorough evaluation. They knew that he was not, the criteria for 5150 was not applicable. And under the law that existed at the time, there was nothing that told them that they could not arrest him at that time. There was no clue. But it does seem clear, at least from Officer Morrow's declaration, the drug paraphernalia was an important part of why they said 11-550, right? I mean, that's what he says. He says, my observations and the fact that he had a pipe. That's the two reasons. Because the observations I made and the decedent's admission that he was in possession of drug paraphernalia. That's why I decided to detain him. The observations he made in addition to the drug paraphernalia. The observations that he made were consistent with somebody who was under the influence as well, which was the disheveled, his bad breath, the bad body odor, the dry mouth, the fact that he sounded like he had a very dry mouth, and Mr. Silva's very strange explanation that he just had a sore throat. And then how fast he was talking. The mother also said, look, he's off his meds. He's been running around all night. You see him wearing three jackets, including a leopard print women's tiny sweater. That might make you smell bad and be sweaty, right? Yes, and that's part of the reason that they took the jackets off to see if he would stop sweating, but he didn't. And his heart rate was still up, and it continued to be up even after they took him to the station. It did come down a bit, but it was still up. And that is consistent with somebody under the influence of a central nervous system stimulant. The officers here under the second prong did not have a 90 minutes later, his pulse rate dropped to 61 beats per minute, right? I am sorry. I'm almost out of time, but you're correct. Here, there was not clearly established law that would put anybody but the, that would put these officers on notice that arresting him was clearly improper under these circumstances. You did your time, but you had a lot of questions, so we'll give you one minute for rebuttal. Thank you, Your Honor. I need to say a couple of things at the beginning. The officers in this case were called upon to make a decision, and it had very significant consequences in this case. They were asked by the decedent's mother in this case to please take him to the She explained that this had happened in the past, that the PERT team had assisted him. He went into the hospital for the 72-hour period, was put back on his medication, and everything was fine. She made repeated calls, and it was, she made a call the day before on the 19th. There was no PERT team. She called again asking for help on the 20th, and she was waiting between the first call and the last call almost three hours. She explained that her son was in grave danger of harming himself. He was roaming into the neighbor's yards. He had started a fire between two cars in the street, and he was running in the traffic and endangering his own life. The officers never quarreled with those assertions. They never quarreled with the fact that in the previous evaluation, the officers had taken him in under 5150 for evaluation and for help. The question I have is would the officers have received all of those details? Because I presume she told that to the dispatch, and the dispatch probably told the officers it's a PERT. But would they have had all those details? I want to make sure I'm not answering you to whore the record that we have, but I provided is the same as that which the officers have on their computers when they answer the call, and the answer would be yes, that it is, albeit in summary form, all available there to them. In addition, they would have been updated by their own dispatch as to that Can you address the second prong, the clearly established here? I mean, the district court opinion is very cursory. You know, I think two paragraphs really didn't discuss it, and that's always in qualified immunity cases. That's always the tough part of is there a clearly established law here? Let me, if I could, answer your question with three specific answers. With respect to cursory, and I wanted to advert to our first argument, which is essentially given the nature of the briefing and the argument which this court has heard, there is not legitimate jurisdiction for an interlocutory appeal. Because, and what we did in our brief in that regard, and the reason why I balk a little when you say cursory, Your Honor, with respect to the factual analysis, it was elaborate, precise, the factual findings that were made by the district court in light of the proper standard for summary judgment, that is, in the light most favorable to the non-moving party, are lengthy. I think they go on for five or six pages on this issue. In our brief, what we did is to put the factual assertions in the appellant's brief right across from the findings. Let's assume we accept your version of the facts, and then, you know, is there an analogous case law that clearly establishes this?  Yes. We cited the state court case of Dunkel, D-U-N-K-E-L, as well as, and you will find these cases cited on pages of 52 through 56 of our brief, multiple cases, including federal cases. Now, in answer to your question, Judge Lee, of course, the issue is always the degree of factual similarity or specificity, and so if you ask me, do you have a case in which somebody's mother said they'd been previously brought in for an evaluation under 5150, and these facts pertain, I would have to tell you no, but there are multiple cases when there are some physical symptoms that would be consistent with either a medical or psychiatric condition and being under the influence, and the courts have repeatedly said if there is a plausible explanation that can be made physically, the officer does not have probable cause. For instance, there is a, I believe it's a circuit case from either this or that. Set aside the probable cause. Okay. I think there's no probable cause. Well, that's on the qualified immunity issue, though. Yeah. On the first prong. It's the second prong, because I agree, given what the officers had, the presumption should have been he's suffering a psychiatric breakdown, and that should have been, you know, where really the, how they investigated it, that should have been the presumption. But now, on the second prong, is in some ways, I mean, this is kind of the type of case qualified immunity applies, where an officer makes a mistake, no doubt a mistake, a very tragic mistake, but there are some conflicting symptoms, maybe on the objectively looking at it, probably suggests a psychiatric problem, but could have also suggested drug use, and, you know, we often, in a qualified immunity case, if there isn't a clear case, we'll give the best of the doubt. I don't know if I answered your question. I was going to say there were three things that we rely on. I specifically adverted to the cases cited are a brief case of 1956. The second thing is, under this court's decision in Drummond, and many other cases, the officer's own training by his own department is sufficient to give him notice as to what are the elements of the offense and what the law requires. And, in fact, counsel for these appellants specifically has, in the record and submitted it to this court, the training that these officers undergo. They take training in psychiatric conditions because they're going to deal with those conditions repeatedly in their job, and that material trained them on 5150 and the legal requirements. In addition, some of the materials that I believe Judge Koh was referring to in the colloquy that she had with counsel is derived from the specific learning domain in POST, police officers' standards and training, that all of these officers had. So my answer is that we rely on the case law. We rely on their own training experience. And the training can be, but it's not dispositive because, I mean, the training itself doesn't establish a constitutional requirement. There are good reasons why it doesn't because we want to encourage police departments to voluntarily train people and have standards without making a constitutional requirement. I appreciate that. But if the issue is, and I need here to talk about a case that we cited, it was written by Judge Bea, and I argued it 20 years ago. And I want to cite to it. It's the Lee v. Gregory case, 363 F. 3rd, 931, and it's a discussion of the qualified immunity issue in that on an arrest. And it's on pages 934, 935. And essentially it says, what are we looking to? What does qualified immunity to arrest mean? We're really asking the question, wouldn't any reasonable officer, any reasonable person have understood that this action is illegal? And so I have a fourth answer, Your Honor, to your question regarding qualified immunity, which is this, that you, as the reviewing court, have to take as given the statements of fact that we have quoted verbatim from the district court, almost all of which, in their brief, they contradict or quibble with or argue against as the premise for the argument that they make to your honors on qualified immunity, which is why we say under Johnson v. Jones, given the way they have quarreled with the findings of fact, asserting again and again their own version of facts. They do that in the opening, but they don't do that in the reply. So I think you might be better off spending your time elsewhere than continuing to fight this jurisdiction and disputing the facts question. Judge Cole, I will defer 100 percent. So I'm looking at Ramirez v. City of Buena Park. It's a Ninth Circuit 2009 case. They quote Lopez, which is another Ninth Circuit case, just saying, as a corollary of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause. Therefore, Ramirez's perfect performance of the finger-to-nose test is relevant when considering the importance of his alleged distorted time perception. So you can correct me if I'm wrong, but this seems to be saying you can't disregard facts tending to negate probable cause when you're determining whether there is probable cause. That is 100 percent right, and that was what the district court judge said and what he relied upon. And what I don't understand is the attack in their brief on the district court's findings, because if you read it, he's saying you have to look at the totality of the circumstances. But you have to address the reasonable mistake of fact. If a lot of these symptoms could be both evidence of a mental health crisis but also could be, or some, consistent with drug use, then why isn't it a reasonable mistake of fact? Because reasonable mistake of fact requires competence, and I don't want to be derogatory because it's just not polite and it's not nice, but I will have to tell you what the evidence showed. Maggi, who was the supervising officer who approved this arrest and who participated in all of the events, Maggi said, well, I think if the eyes are dilated, well, either dilated or constricted as one of the two, then he may be under the influence. He didn't even know that. The evidence that is before the court with respect to the totality was such that it could reasonably exclude the possibility under their own training. What's the famous line that's always repeated in these cases again and again? Qualified immunity protects all but those who willfully violate the law or are plainly incompetent. And with respect to the decision to effect an arrest, and this, as I say, had tragic consequences, not just because it put him in jail, but because when Maggi booked him, I mean, when Murrow booked him in the jail, he never told the jail medical people that this man has schizophrenia. So they left him in a cell. He decompensated, and 30 hours later, he's completely decompensated. They tried to remove him from the cell to bring him to a hospital, and the consequence of that was the use of force, which resulted in his death. I'm sorry. May I ask you a question? I'm ignorant of the answer. That's why I'm asking the question. Can a marijuana pipe be used to smoke methamphetamine? Marijuana pipe can be used to smoke anything. Including methamphetamine?  Thank you. So I want to carefully and truthfully answer your question, but to say that there was no indication of any incrustation of any powder or anything on the marijuana pipe. Second question, did anybody ask Mrs. Silva what she meant by recently? Well, let me answer that question by saying the answer to that is no, and moreover, that is a disputed fact, which they argued repeatedly, and the district court judge did not rely on. Specifically, it's not Mrs. Silva. It's Mrs. Allen, but she's the mother. She testified. I never said that, and interestingly enough, although they submitted the body-worn camera, there was no recording, whether by audio or on body-worn camera, of this alleged statement that she made, which was entirely contradictory to her sworn deposition and contradictory to two or three separate statements that she made, which were recorded in the telephone calls to the police department. Your position is on a motion for summary judgment, and we should disregard what the policemen told each other about recently. The answer to that is no, but in the absence of any definition or explication of recent, it cannot legally be relied upon to justify it. DiRiccio made the statement, and Mrs. Allen said, I never said that. Now, I also need to say this. The police in this case, to my mind, are really getting away with something. The district court judge, they were named one of the three, or all three of them, in nine separate causes of action. The district court judge threw out everything except Murrow on the arrest and Maggi on the supervision. So when there's a suggestion, oh, the district court judge just failed to do an analysis, he did a precise analysis, to my way of thinking, too scrupulous and, well, he was looking to help them out if they deserved a break. But on the issue of whether a reasonable person or any reasonable officer, and that's the fifth answer, Judge Lee, to the question that you put. What's the second prong? Let's address the second prong. Even in the absence of any case law, some things are so clear that any reasonable person would understand that. Apropos of that, my point is when the totality of circumstances are such that not only do the physical symptoms not become consistent with being under the influence, but they rebut it so that, for instance... You've exceeded your time, so please wrap up. All right. When somebody who's under the influence of a stimulant has flutter of the eyelids, and the video here says he had no flutter, when somebody who, as was pointed out in the colloquy, he had HGN, and that's inconsistent with somebody who is under the influence, and when somebody has dilated pupils, or rather somebody has constricted pupils, and methamphetamine makes them dilated, and that's completely inconsistent when you have three of those telltale signs, and they all say, no, he's not under the influence, then somebody's either being very cavalier about their job to avoid a long interview in a hospital, or they're incompetent in light of their training. Thank you so much. Thank you.  The consequences of what happened here is not relevant to what's before the court. Also, the other causes of action that the judge dismissed are not relevant as to what's before the court. What's relevant here is that the district court did not do an appropriate evaluation of the second prong of qualified immunity, and there was no mandatory authority putting these officers on notice, and there's a conflict in the persuasive authority. The cases cited by plaintiffs do not stand for the proposition that they're asking this court to take. There are several cases on the other side of the issue. Recently, the California Court of Appeals said that one may be guilty of being under the influence of drugs in violation of health and safety code, Section 11-550, by being in that state in any detectable manner. That's People v. Canty, 32, California, 4th, 1266. There are also two unpublished Ninth Circuit cases and two district court cases that show where people have some of the signs and symptoms of being under the influence, but not all of them. There was probable cause. The courts have established probable cause. There's no indication that there are cases putting all reasonable officers on notice that there was that their actions here would be unconstitutional. There's no indication that Mr. Silva was a habitual user that would have made them have to throw away some of their findings. These officers are clearly entitled to qualified immunity here, and they shouldn't be held to the same standards as a psychologist or psychiatrist or a toxicologist. Can I ask you a question? Earlier you had said that there was no evidence that Mr. Silva was a danger to himself or to others, and I'm looking at the police dispatch that the officers would have gotten on their computer, and it says subject is running between vehicles and into the street. It says male is heard yelling at female. Female is saying that male is getting violent. Male wants a ride. It says, you know, reporting party is going to stay locked in her car, Ford Expedition. It says reporting party has locked herself in her vehicle, and it just keeps going that, you know, diagnosed schizophrenic should be on meds, or reporting party thinks he's off, he's outside yelling and screaming. Male is heard yelling at female. Female is saying that male is getting violent. So at least that, you would agree, is in the dispatch record that Officer Morrow would have been aware of, correct? Yes, and on the officers who were required to do their independent investigation while they were there, he wasn't showing any of those signs and symptoms. But even if that was true, that would have given them probable cause to arrest him for starting those fires, for potentially assaulting his mother. So there would have been probable cause on those other grounds as well. You think there was probable cause to arrest him on all those other crimes based on the record before us? If we're taking what Ms. Ellen said at face value, then yes. Thank you both for the helpful argument. The case has been submitted, and we are adjourned for the day. Thank you, Your Honor.
judges: BEA, LEE, KOH